

**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MAR 31 2011

The Honorable Robert Moore
Chair, Leflore County Board of Supervisors
306 West Market Street
Greenwood, Mississippi 38930-4355

    Re:   <u>Investigation of the Leflore County Juvenile Detention Center</u>

Dear Chairman Moore:

    I write to report the findings of the Civil Rights Division's investigation of conditions at the Leflore County Juvenile Detention Center ("LCJDC") in Greenwood, Mississippi. On August 14, 2009, we notified Leflore County, Mississippi, of our intent to conduct an investigation of LCJDC pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"), and the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"). Both CRIPA and Section 14141 give the United States Department of Justice ("DOJ") authority to seek a remedy for a pattern or practice of conduct that violates the constitutional or federal statutory rights of youth in juvenile justice institutions.

    We thank the staff members at LCJDC for their helpful and professional conduct throughout the course of the investigation. We received complete cooperation and appreciate their receptiveness to our consultants' on-site recommendations. Staff assisted our investigation by providing access to records and personnel and by promptly responding to our requests in a transparent manner. We have every reason to believe that the County and the staff of LCJDC are committed to remedying deficiencies at the facility.

## I. <u>SUMMARY OF FINDINGS</u>

    The youth confined to LCJDC are subjected to conditions that violate their constitutional and federal statutory rights. Our investigation revealed systemic, egregious, and dangerous abuses perpetuated by a lack of accountability and controls. LCJDC fails to prevent unconstitutional harms, or minimize the risk of such harms, through undue use of restraints, arbitrary imposition of punishment, inadequate grievance procedures, failure to report and investigate abuse, inadequate classification systems, inadequate rehabilitative treatment, inadequate medical and mental health care, inadequate suicide risk protections, inadequate environmental safety, inadequate staffing, and inadequate educational services. We found that:

*Attachment 1*

- Youth are dangerously and routinely shackled to metal beds for discipline and punishment;
- Staff have unfettered discretion to immediately administer punishment, and isolation is used excessively for punishment and control;
- Suicidal youth are not assessed by mental health professionals despite known risks;
- Internal investigations dismiss abuse complaints against staff as manipulative; and
- No accommodations exist for children with learning disabilities.

These systemic deficiencies exist because generally accepted juvenile justice standards are not followed. We found that LCJDC staff members do not receive minimally adequate training and that existing policies and procedures are inadequate to ensure constitutionally adequate care and custody of the youth confined to the facility. Staff members fail to report allegations of abuse to the State and appear to routinely violate youths' rights with impunity.

The widespread and significant deficiencies at the facility are a result of significant departures from accepted juvenile justice standards and violate the Fourteenth Amendment's mandate that youth in custody be protected from harm. In this letter, we provide recommendations that are minimally necessary to bring the facility into compliance with the Constitution and federal law.

## II. INVESTIGATION

On November 11-12, 2009, we conducted an on-site inspection of LCJDC accompanied by expert consultants in the areas of protection from harm and education. Before, during, and after our tour, we reviewed extensive documentation provided by the County, including policies and procedures, incident reports, unit logs, and training materials. Additionally, we interviewed LCJDC administrators, staff, and youth. We observed youths in a variety of settings, including their living units, dining areas, and in the facility's only classroom. Consistent with our commitment to conduct a transparent investigation and provide technical assistance, our expert consultants conveyed their initial impressions and concerns to the County during exit conferences held at the conclusion of the tour.

## III. BACKGROUND

The LCJDC is a 30-bed short-term facility owned and operated by Leflore County for the detention of youth. Male and female youth between 10 and 17 years of age are detained at LCJDC for periods ranging from a few hours to more than 30 days. In addition to detaining youth from Leflore County, the facility contracts with 19 other Mississippi counties to detain youth.[1] As required by state statute, LCJDC and other juvenile justice facilities in Mississippi are monitored by the State Department of Public Safety's Juvenile Detention Facilities Monitoring Unit on a quarterly basis. Despite the relatively limited bed capacity of LCJDC, the number of youths detained at the facility, over time, is significant. During the period between

---

[1]        The counties that contract with Leflore County for juvenile detention include Attala, Bolivar, Calhoun, Carroll, Choctaw, Coahoma, Grenada, Holmes, Humphrey, Leake, Montgomery, Panola, Quitman, Sunflower, Tallahatchie, Tate, Tunica, Yalobusha, and Webster.

July 2008 and September 2009, 544 different youths were held at the facility. Notably, some of these 544 youths were detained at the facility multiple times during the time period. During our on-site visit in November 2009, the facility had a youth population of seven males and six females who were from eight different counties.

The two-story LCJDC building was converted from a mental health facility to a juvenile facility in 1995, with the original construction dating back to the 1950s. In addition to LCJDC, the building houses the Leflore County Youth Court and offices for the court's counselors. The juvenile detention portion of the building consists of two floors and is outfitted like an adult jail. The layout is primarily double-bunked cells with metal frame beds, built-in desks or tables, and stainless steel toilets and sinks. Each cell has a metal door with a small window, and lighting is controlled externally by a switch near the door. The upper level customarily houses female youths and includes the facility's only classroom, which is outfitted with books, desks, and an adjacent computer lab. The lower level of LCJDC customarily houses male youths and has a small dayroom for programming in addition to cells. An external door on the lower level hallway connects the cells to a very small outdoor "recreation area" that is completely enclosed by tall brick walls. This outdoor recreation area is designated as the point of egress in case of fire or other emergency.

## IV. FINDINGS

In violation of their constitutional rights, youth at LCJDC are inappropriately and dangerously restrained, arbitrarily punished, denied adequate medical and mental health care, not protected from suicide risk, inadequately supervised, and inadequately educated. Unsafe conditions of confinement, combined with a paucity of meaningful programming, education and other activities, create an environment at LCJDC that is dangerous and detrimental to youth development and well-being. The environment is especially harmful for those youth who spend long periods of time at LCJDC or who frequently return to the facility.

## A. LEFLORE COUNTY IS FAILING TO PROTECT YOUTH FROM HARM AT LCJDC

CRIPA and Section 14141 authorize DOJ to seek a remedy for a pattern or practice of conduct that violates the constitutional or federal statutory rights of youth in juvenile justice institutions. 42 U.S.C. § 1997; 42 U.S.C. § 14141. Youth detained at LCJDC are protected by the Fourteenth Amendment and have a substantive due process right to reasonably safe conditions of confinement and freedom from unreasonable bodily restraints. Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily [detained] - who may not be punished at all - in unsafe conditions."). The Fourteenth Amendment, rather than the Eighth Amendment, applies because the youth are held for detention or rehabilitation,

- 4 -

not punishment.[2] The Mississippi youth delinquency statute's statement of purpose provides that "each child coming within the jurisdiction of the youth court . . . become a responsible, accountable and productive citizen, and that each such child shall receive such care, guidance and control, preferably in such child's own home as is conducive toward that end and is in the state's and the child's best interest." Miss. Code Ann. § 43-21-103.

To determine whether the Fourteenth Amendment was violated, a balancing test must be applied: "[I]t is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" Youngberg, 457 U.S. at 320 (quoting Poe v. Ullman, 367 U.S. 497, 542 (1961)). The Youngberg Court went on to hold that "If there is to be any uniformity in protecting these interests, this balancing cannot be left to the unguided discretion of a judge or jury." Id. at 321. Instead, the Court held that there is a constitutional violation if detaining officials substantially depart from generally accepted professional standards, and that departure endangers youth in their care. See id. at 314.

As a general matter, the Supreme Court has held that corrections officials must take reasonable steps to guarantee detainees' safety and provide "humane conditions" of confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994); Hare v. City of Corinth, 74 F.3d 633, 639 (5th Cir. 1996) (recognizing a duty to provide detainees with basic human needs including protection from harm). In addition, an official's failure to maintain adequate policies, procedures, and practices for the prevention of suicides may violate a detainee's due process rights. Silva v. Donley County Texas, 32 F.3d 566, 1994 WL 442404, *5-7 (5th Cir. 1994) (unpublished) (holding sheriff's failure to establish suicide detection and prevention training for jail personnel, condoning de facto policy of sporadic cell checks, and absence of a policy for observing "at-risk" detainees may rise to deliberate indifference to known risk of suicide in detention settings).

Finally, conditions of confinement claims may be based not only upon existing physical harm to youth, but also on conditions that threaten to cause future harm. Helling v. McKinney, 509 U.S. 25, 33 (1993) (stating "[i]t would be odd to deny [relief to detainees] who plainly proved an unsafe, life-threatening condition in their [facility] on the ground that nothing yet had happened to them."). In Helling, the court recognized various circuit courts holding that "a [detainee] need not wait until he is actually assaulted before obtaining relief" and that the Constitution "protects against sufficiently imminent dangers." Id. at 33-34; see also Herman v. Holiday, 238 F.3d 660 (5th Cir. 2001) (recognizing Helling standard); Gates v. Collier, 501 F.2d 1291, 1308-11 (5th Cir. 1974) (holding that failure to provide adequate systems to protect inmates against future harm including physical assaults and abuse constituted cruel and unusual punishment).

---

[2] In Ingraham v. Wright, the Supreme Court rejected application of the Eighth Amendment deliberative indifference standard in a non-criminal context. 430 U.S. 651, 669 n.37 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). In addition, the Court held that the Due Process Clause of the Fourteenth Amendment was the proper constitutional gauge to determine the rights of adults detained by a state, but not yet convicted of any crime. Bell v. Wolfish, 441 U.S. 520 (1979). See also, Scott v. Moore, 85 F.3d 230, 235 (5th Cir. 1996). At a minimum, youth should be accorded the same constitutional protections.

### 1.    Youth at LCJDC are subjected to undue restraint.

Our investigation revealed numerous uses of dangerous and unnecessary restraints at LCJDC.  The justifications offered by staff for the use of the restraints were ambiguous or clearly inappropriate.  Youth are frequently shackled to the bed in their cell in response to non-dangerous actions and for punishment.  Documentation of the application of restraints failed to adequately describe the reasons for or the duration of the uses of restraint.[3]

Youth at LCJDC may not be unduly restrained or subjected to excessive use of force by staff.  See Youngberg, 457 U.S. at 316; Morales v. Turman, 364 F. Supp. 166, 173 (E.D. Tex. 1973) (issuing a preliminary injunction where the court found that juvenile facilities' widespread practice of beating, slapping, kicking, and otherwise abusing youth in the absence of exigent circumstances violated youths' rights).  In determining whether a violation exists under the Eighth Amendment, courts consider whether "force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" to determine whether force was excessive.  Hudson v. McMillian, 503 U.S. 1, 6 (1992) (citing Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  Prison officials "may take all reasonable steps to insure proper prison discipline, security and order" but must ensure "that inmates are not subjected to any punishment beyond that which is necessary for [ ] orderly administration." Gates v. Collier, 501 F.2d at 1309.  Hence, the use of force after an inmate has been subdued and an emergency has dissipated, or which is disproportionate to the force needed to regain control, violates the Eighth Amendment.  Hope v. Pelzer, 536 U.S. 730, 738 (2002) (leaving an inmate handcuffed to a post after order had been regained constituted cruel and unusual punishment); Valencia v. Wiggins, 981 F. 2d 1440, 1447 (5th Cir. 1993) (applying a chokehold on disruptive inmate who refused to exit cell and striking inmate while handcuffed, kneeling, and non-resisting was malicious and sadistic, causing harm).  The use of mechanical restraints should be limited to circumstances where a youth presents a clear danger to herself or others.  See H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir. 1986) (disproportionate response of guard to juvenile detainee, which included shackling to bed, "amounted to punishment in violation of due process clause").

Generally accepted professional standards require that staff only use physical force or mechanical restraints to the degree and duration necessary to bring a situation under control. Every application of mechanical restraints – including handcuffs, leg shackles, belly chains, or other such restraints – must be fully documented, including the circumstances leading to the application of restraints and the duration that the restraints were applied.  Any restrained juvenile should be constantly observed by staff to ensure safety.

---

[3]    The facility's policy manual is ambiguous about the County's expectation for documenting uses of force. One section states that the "use of force resulting in injury to staff or youth and the use of mechanical restraints will be fully documented and reported," suggesting that only use of force incidents involving injury should be documented.  Several pages later, however, the manual states that a "written report ... will be completed no later than seventy-two (72) hours following the incident depending on the circumstances of the incident." There is no explanation of the determinative circumstances, and the quote suggests that incident reports are required even where there is no injury.  Regardless of which part of the policy manual is the County's official policy, neither is consistent with generally accepted professional standards, which provide that facility staff document all incidents, except for handcuffs used in transportation, in which physical force or mechanical restraints are used.

- 6 -

Examples of excessive or undue restraints and lack of adequate documentation at LCJDC include:

- In October 2008, A.A.,[4] a 13 year old detainee, began kicking his cell door and cursing. Two officers entered the youth's cell and "chained" A.A. to the bed. There is no documentation of the precise manner or length of time that the youth was restrained. Staff later entered A.A.'s room to discover that he had defecated and thrown feces on the cell window. He was restrained a third time in November 2008 for 15 minutes as punishment for kicking and beating on the door.

- B.B. was placed in leg restraints in October 2008 as punishment for flooding the toilet in his cell. He was released once he promised to stop flooding the cell.

- In February 2009, C.C. was removed from class and isolated in his cell for failure to follow classroom rules. Once C.C. entered his cell, he began beating on the doors and walls. Two officers then entered the cell and placed C.C. in leg shackles.

- In June 2009, leg irons were placed on D.D. to prevent him from banging on the cell door. There is no documentation regarding the duration of this restraint.

- In May 2010, a youth banged on his door to request hygienic tissue. A detention officer denied the request, and detention staff subsequently went from room to room restraining youths with shackles and handcuffs. One youth was hogtied to the bed after he argued with detention officers, and all youths remained in the restraints for approximately one hour.

In none of the circumstances described above were the youths a danger to themselves or to others. Banging or kicking doors or walls, cursing, shouting, and flooding a cell are annoying behaviors, but none present a danger. Instead, in each of the incidents described above, LCJDC's practice of shackling served a primarily punitive purpose. Therefore, each restraint described above was undue and unconstitutional.

Staff members at LCJDC freely admit that they restrain youth to beds. According to facility staff, youth are restrained to the bed when staff cannot de-escalate a youth's misbehavior through talking (although none of the incidents described above evidence attempts by staff to de-escalate the situation before restraints were applied). The facility manual places a time limit of 15 to 30 minutes on the use of restraints. We were also told that staff usually link restraint devices together to provide enough length for youth to use the toilet while shackled to a bed. Neither the purported time constraint nor extending the length of the shackling restraint makes this practice acceptable.

We conclude that the restraint practices of LCJDC detention staff violate the Constitution and egregiously deviate from generally accepted professional standards.

---

[4]     Fictional initials are used throughout the letter to preserve the anonymity of youths.

### 2.     LCJDC violates the due process rights of youth by arbitrarily imposing punitive measures.

Our investigation revealed numerous instances where LCJDC staff imposed sanctions without following any disciplinary process. LCJDC must provide youth with procedural due process if they are charged with a disciplinary violation while detained. See Wolff v. McDonnell, 418 U.S. 539, 563-65 (1974) (finding that prison disciplinary hearings require due process with respect to presentation of charges, evidence, and witnesses).

There are no processes at LCJDC for notifying youth of facility rules or for imposing discipline. The absence of an established disciplinary system results in an informal system of control based on the unfettered discretion of individual detention officers; sanctions are immediately imposed by staff for whatever actions staff deem punishable. These practices are unconstitutional. For example:

- In August 2008, staff recorded in a facility log that E.E. and F.F. had fought each other and were therefore not allowed out of their cells for any reason other than showering.

- In September 2008, G.G. allegedly started a fight in class and was therefore isolated in his cell. According to the facility log, the youth was "to not come out of his cell . . . for any reason." It is unclear how long this restriction was in place.

- In November 2008, H.H. reportedly became disruptive and threatened to kill himself while in court. Two detention officers forcibly removed H.H. from the courtroom and placed him in his cell. After the youth struck the door of his cell, "disciplinary actions were taken." We have no indication of what is meant by "disciplinary actions."

- In February 2009, some youths were allegedly overheard plotting to attack a detention officer. Consequently, "all juveniles were disciplined by no showering."

- Thirteen-year-old I.I. stated during our November 2009 interviews that one of the detention officers at LCJDC had whipped him with a belt in his room as punishment for being disruptive in class.

The lack of any disciplinary system or due process protections for youth at LCJDC violates their constitutional rights.

### 3.     LCJDC is unlawfully failing to report and investigate abuse.

LCJDC also unconstitutionally places youth at risk of repeated harm by failing to properly report and investigate abuse by staff. When an allegation of child abuse is made, the allegation should be reported to the proper authorities for investigation. Juvenile justice facility staff are typically mandated by statute to report allegations of child abuse to the state's child

protective services agency. In Mississippi, "any person having reasonable cause to suspect that a child is a neglected child or an abused child shall cause an oral report to be made immediately … to the Department of Human Services" which in turn initiates an investigation. Miss. Code Ann. § 43-21-353 (1) (2010). As such, LCJDC staff must report all instances of alleged abuse, without regard to credibility, to the State Department of Human Services. This is not occurring.

In addition to reporting allegations of abuse to the proper state agency, LCJDC must conduct internal investigations of alleged abuse in order to keep youth reasonably safe. Once an allegation of abuse has been made, a proper investigation is required to protect youth from staff abuse by collecting evidence to verify or disprove the allegation. These investigations are essential to identify staff in need of training and/or discipline, as well as to clear staff who have been wrongfully accused. The investigation process must have reasonable integrity, preserve all physical evidence (e.g., videotape footage, documentation and photographs of injuries, clothing, etc.), obtain statements from all youth and staff involved in the incident and those who witnessed the incident, and utilize other sources of information to corroborate or refute the allegations (e.g., logbooks, other sources of facility documentation).

To ensure that youth are provided adequate safety, youth subjected to a use of force must be seen, and treated if necessary, by a medical professional, and all injuries should be documented. Medical staff can also be an avenue for youth to report abuse or mistreatment. Further, even when youth do not report abuse or mistreatment, medical staff members are mandated reporters of child abuse if abuse is suspected due to the nature of an injury.

LCJDC unlawfully fails to provide these protections. The facility does not have adequate procedures for properly reporting and investigating allegations of child abuse. When asked about procedures that staff follow upon receiving an allegation of abuse, staff members were unaware of their duty to report abuse allegations to the State. Further, internal investigations are cursory and do not include examination by medical staff, photographs of alleged injuries, or other basic elements necessary for accurate investigations. Indeed, it appears that the underlying assumption of any facility investigation of abuse is that the complaining youth is attempting to manipulate others. The following examples illustrate the deficiencies with LCJDC investigations:

- In February 2008, youth J.J. alleged that he was sexually assaulted by a staff member and later attempted suicide at the facility. Facility management conducted an egregiously deficient investigation by speaking with the youth, then speaking with the staff member, and then simply concluding that there was no evidence of a sexual assault. There is no indication that the State was contacted regarding the abuse allegations. In a memorandum notifying a local police chief of the results of the investigation, LCJDC's director stated that J.J. was "using the system against the system to gain sympathy" in order to avoid a possible felony charge. The memo concludes with the exhortation: "Do not let this troubled young man's false allegations stop [the County] from allowing Leflore County to serving [sic] your Juvenile Detainment Needs."

- A January 2009 memorandum reports the conclusion of the facility's grossly inadequate investigation into youth K.K.'s allegations that he was assaulted by an LCJDC custody officer. The investigation consisted of the director and assistant director interviewing the accused officer and the officer's supervisor, both of whom denied the assault. The memorandum notes that K.K. bore no visible signs of assault but does not contain any alleged details of the incident, including the date it allegedly occurred. The director asserts in the memorandum that "[t]hese juvenile(s) will say and do anything to shift the concerns away from what they did or are doing." There is no evidence indicating that these allegations were referred to the State.

We find that LCJDC's reporting and investigation of alleged abuse is wholly deficient and unlawfully violates the rights of the young people detained in the facility.

### 4.    LCJDC's unlawful classification system places youth at great risk.

Youth at LCJDC are not safe due to the facility's inadequate classification system. The Constitution requires that youth be provided a reasonably safe environment. In a juvenile justice facility, a critical piece of keeping youth safe turns on a classification system to determine where and with whom a youth should be housed. The classification should take into account a youth's age, charge offense, history of violence and escape, vulnerability to victimization, gang membership or affiliation, health and mental health concerns, and institutional history.

LCJDC only considers a youth's size, age, and county of residence when making housing assignments. The failure to account for other obviously relevant factors places youth at grave risk of harm. During our interviews with youth at the facility, for example, we discovered that youths L.L. and M.M. were both arrested and sent to LCJDC for fighting each other but were inexplicably assigned to share a cell together upon arrival at LCJDC. In addition, youths N.N. and O.O. independently told us that they were sharing a cell despite a conflict between them. Both youths had repeatedly asked staff to separate them but no action had been taken.

We find that the lack of an adequate classification system at LCJDC places youth at an unacceptably high risk of victimization, does not keep youth reasonably safe, and is therefore unconstitutional.

### 5.    LCJDC lacks adequate medical and mental health care.

Reasonable protection of confined youths' physical and mental safety requires adequate medical treatment, mental health treatment and suicide prevention measures. See Youngberg, 457 U.S. at 323-24 & 323 n.30; Morales, 364 F. Supp. at 175. Appropriate care for youths' mental health needs is as important as caring for their medical needs. Gates v. Cook, 376 F. 3d 323, 332-33 (5th Cir. 2004) (citing Partridge v. Two Unknown Police Officers of City of Houston, Texas, 791 F.2d 1182, 1187 (5th Cir. 1986)). Further, providing only medication to youth with psychiatric disabilities, in the absence of additional or other mental health services, violates their constitutional rights. Gates, 376 F. 3d at 335 (holding that the confinement of inmates with severe mental illness on Mississippi's death row with no mental health care other

- 10 -

than medication was "grossly inadequate" and constituted deliberate indifference in violation of the Eighth Amendment).

While we did not include experts in medical and mental health services in our investigatory tour, the obvious dearth of even the most basic medical and mental health care at LCJDC leads us to conclude that the constitutional rights of detained youth to adequate medical and mental health care are being violated.

> **a. LCJDC provides inadequate medical screenings and fails to seek appropriate medical treatment, placing youth at significant risk of serious harm.**

By failing to properly screen youth for medical conditions, LCJDC remains deliberately indifferent to potentially serious harm. In accordance with generally accepted juvenile justice standards, Mississippi state law requires that youth undergo a health screening upon admission to a juvenile detention center, within one hour or as soon thereafter as reasonably possible, in order to obtain information about the juvenile's mental health, suicide risk, alcohol and other drug use and abuse, physical health, aggressive behavior, family relations, peer relations, social skills, educational status, and vocational status. See Miss. Code Ann. § 43-21-321. This statutory requirement is acknowledged in LCJDC's manual, but documentation showed that facility staff members do not comply with this legal requirement.

Documentation purported to show that the 13 youth detained at the time of our investigation tour had been screened in compliance with State law with respect to physical health. However, upon close examination, that same documentation noted that four youth entered the facility at 12:23 p.m. on November 10, 2009 and that medical screening for each of the four youth was also completed at 12:23 p.m. that same day. It is not credible that all four youth were admitted and medically screened within the space of one minute.

We found no evidence that LCJDC's officers are trained by medical professionals on how to conduct initial medical screenings. Generally accepted professional standards require that detention officers receive training from a health authority on conducting initial medical screenings of youth. Without proper medical screening by appropriately qualified staff, youth are subjected to a high risk that medical or mental health problems will be undetected and unaddressed at the facility.

During individual interviews, our experts specifically noticed two youths, P.P. and Q.Q., who exhibited behaviors consistent with neurological impairments (e.g., Traumatic Brain Injury, tic disorders) and/or other health issues. The records for these two youths did not document these explicit behaviors, and when we asked the facility director about the youths' medical status, he stated he had not noticed these signs. Significantly, P.P. had been detained at LCJDC on multiple occasions without any treatment for the possible disability.

Because there are no medical personnel on-site, facility policy requires staff to take youth to see a physician if a medical screening indicates a need for emergency care or if a parent, guardian, or youth court designee makes a written request for medical care. We found that, instead, untrained custody officers often provide basic medical care and improperly make decisions on treatment. For example:

- In March 2008, R.R. began vomiting in her room. Custody officers offered an over-the-counter stomach medication to the resident, but she refused. No other medical action was taken.

- In June 2008, S.S. reported to a detention officer that he fell in his room and dislodged his tooth. The detention officer and another staff member looked in S.S.'s mouth and reported that "you could see that he pull[ed] the tooth out and he was OK." No further action was taken.

- In December 2008, T.T. complained to facility staff that he was having chest pains. The youth was taking lithium, a psychoactive drug often used for the treatment of bipolar disorder. Like many psychoactive drugs, lithium may reach dangerously toxic levels if not appropriately monitored by a medical professional and has a number of potentially serious adverse side effects. We could find no evidence that E.U. was examined by a medical professional following his complaint of chest pain.

- In July 2009, U.U. complained that his stomach was upset on the same day that his mother called and advised the facility that U.U. did not have his asthma medication. The next day, when U.U. complained of chest pain and began throwing up blood, a custody officer reviewed the unit log and noted that no action had been taken the previous day regarding the youth's illness. U.U. was then taken to the hospital by custody staff and diagnosed with bronchitis.

- In May 2010, a juvenile at the facility was suffering from tooth pain and could not get attention from a detention officer until he began banging on the cell door. One of the detention officers entered the cell and beat the youth until the juvenile was wailing and crying. The youth did not receive medical attention for the tooth.

### b. LCJDC is deliberately indifferent to suicide risks and the related serious mental health needs of youth, placing them at significant risk of serious harm.

Among the most dangerous practices at LCJDC is the facility's failure to meaningfully screen or monitor potentially suicidal youth. Youth at great risk of harm are exposed to conditions that are not reasonably safe and are therefore unconstitutional.

In order to provide reasonable safety to potentially suicidal youth, all youth placed on suicide precautions must be regularly monitored by mental health professionals. Any staff person may place a youth on suicide precautions initially, but the precautions should only be

removed following an assessment by a mental health professional. At LCJDC, if a youth's screening indicates a need for additional assessment, staff members are supposed to schedule an appointment with the local mental health clinic and transport the youth to the clinic. This does not occur. Indeed, records demonstrate instances where youth who are placed on suicide precautions by staff are never assessed by mental health professionals at any time during their detention.

Detention staff should also provide consistent monitoring of youth on suicide precautions to observe behavior and ensure the youth's safety and welfare. LCJDC does not regularly monitor youth while they are on suicide precautions, and it is unclear who decides when youth may be removed from precautions. For example:

- In May 2008, V.V. was discovered tying a sheet around a pipe in his cell in an attempt to commit suicide. Detention staff monitored the youth and required him to wear only a paper gown. However, despite his suicidal behavior, no mental health professional ever assessed or treated V.V.

- In June 2008, an officer bribed W.W. and X.X. to keep them quiet about an attempted suicide. W.W. reportedly knocked on her cell door continuously during X.X.'s attempted suicide in an effort to get the attention of staff but was ignored by the two officers on duty, one of whom ("Officer 1") was smoking a cigarette. The officers continued to ignore W.W. until they heard her screaming. Staff discovered that X.X. had tied a blanket tightly around her neck and a railing on the ceiling. After the noose was removed by staff, Officer 1 told the two youths not to tell anyone about the incident, and allowed them to spend several hours eating snacks and playing computer games. Officer 1 also told the other officer not to tell anyone about the incident, especially the director. The incident was eventually reported and investigated. Despite the facility director's recommendation that Officer 1 be terminated, Officer 1 remains at LCJDC.

- In September 2008, Y.Y. began banging his head against the cell door and tied his uniform shirt around his neck. Y.Y.'s cellmate notified two detention officers who then entered the cell, removed the shirt, and placed Y.Y. in mechanical restraints. The officers later returned to the cell after Y.Y. managed to tie a sheet around his neck despite the restraints. The officers then removed the restraints, "stripped" Y.Y., placed him in a paper gown, and re-applied mechanical restraints. Y.Y. then attempted to tie the paper gown around his neck and stuffed tissue in his nose and mouth. The incident report concludes by stating that the officers took away both the gown and the tissue. No further action was taken.

- A March 2009 mental health assessment of Z.Z. described him as "suicidal and psychotic" and in need of "immediate attention." He was placed in a paper gown and put on suicide watch after the assessment. Five days later, though still on suicide precautions, Z.Z. was observed in full clothing after staff returned his clothing in

violation of a facility directive. It is unclear when or if Z.Z. was ever removed from suicide watch during his 18-day detention at LCJDC.

- In May 2009, A.B. was observed in his room crying, with a torn blanket tied tightly around his neck. Detention staff removed the blanket and placed A.B. in a suicide gown, but he was not assessed by a mental health professional until three days later. A suicide watch log purportedly showed that the youth was observed by detention staff every four minutes while on suicide watch, but the observational times and detention officer's initials were typed in for the entire shift, calling into question the veracity of the observations. Given the physical set-up of the facility, it is highly unlikely that the detention officer could have observed A.B. as reported on the suicide watch log and typed in the information every four minutes.

- In September 2009, A.C. was placed on suicide watch after a local mental health professional determined that he expressed suicidal ideations, intent to self harm, and auditory hallucinations. The suicide watch log indicates that a detention officer observed A.C. every four minutes. The veracity of the observations is dubious, however, given that the times and officer's initials are all typed.

Finally, suicide hazards remain in youth cells. While the County has removed exposed metal piping in many of the cells, some protrusions and tying off points still remain. In sum, LCJDC's grossly inadequate suicide prevention practices violate youths' constitutional rights to adequate safety and adequate mental health care, and place these youths at life-threatening risk.

### 6.  LCJDC's fails to provide adequate programming.

Youth at LCJDC have a constitutional right to adequate treatment. Youngberg, 457 U.S. at 323; Morgan v. Sproat, 432 F. Supp. 1130, 1146-55 (D. Miss. 1977) (holding that juvenile facility must provide adequate treatment, including proper behavior management and recreation programs, among others). That right is abrogated by LCJDC's failure to provide adequate programming and behavior management systems. In order to provide constitutional care, juvenile justice facilities must provide rehabilitation programming and treatment while youth are confined. Thus, generally accepted professional standards require that juvenile justice facilities provide education, recreation, and meaningful activities such as group and individual therapy, social skills training, and other programming. LCJDC fails to provide these services, and the lack of structure and meaningful programming activity is not only violating the youths' rights but is predictably resulting in behavior problems.

Youth at LCJDC spend an inordinate amount of time playing cards or dominos while in the small dayroom or while locked in their cells. Besides schooling, the only regularly scheduled activity for youth is a two-hour arts and crafts class held in the evenings twice per week. On weekends, youth are allowed to watch television if they have behaved during the week and may attend religious programming on Sundays. However, youth spend most weekend time locked in their cells. Furthermore, recreational logs indicated long gaps between opportunities for youth to engage in large muscle exercise. Although there is a small outdoor recreation yard outfitted with

- 14 -

a basketball hoop, it appears to be rarely used and was not used during our November 2009 tour. During an interview, youth A.D. stated that he had been permitted outside for recreation only twice during his 36-day period of detention. Without activities to keep youths mentally and physically occupied, youth at LCJDC create their own activities, including beating and kicking walls and doors, yelling, cursing, picking fights, and other negative behavior.

The problems resulting from the paucity of programming activity are exacerbated by the lack of a behavior management program at LCJDC. Children and adolescents typically lack strong impulse control, and youths at juvenile detention facilities are often particularly affected by their lack of impulse control and lack of an ability to make good choices to control their behavior. Therefore, it is critical that a juvenile facility have in place a behavior management system that provides immediate, consistent, and tangible reinforcement of desired behaviors. Although LCJDC once purchased a behavior management system manual, it was never used. According to staff, LCJDC officials delayed implementing the system because they expected the facility to move to a new building.

We find that LCJDC's failure to provide adequate programming activity – regardless of the facility's physical limitations – contributes to increased risk of suicide, violence and excessive discipline and violates the youths' constitutional rights.

### 7.  LCJDC fails to provide adequate staffing levels for supervision of youth.

Some of the above described problems appear to have resulted from inadequate staffing. LCJDC's serious deficiencies in staffing places youth at risk of harm because of reduced accountability, overreliance on restraints, inadequate youth supervision, and inadequate suicide prevention practices. This deficiency contributes to violations of youths' constitutional rights to reasonably safe conditions of confinement. See Youngberg, 457 U.S. at 324.

LCJDC operates with three detention officers for a population of up to twenty-four youths of both genders. The facility has no means to electronically monitor youth in their rooms in addition to visual checks. With two floors and two control rooms, the current staffing pattern is inadequate for LCJDC, particularly when one or more youths are placed on suicide watch.

### 8.  LCJDC fails to provide youth a reasonably safe living environment.

LCJDC's physical environment poses an unreasonable risk to the safety and welfare of detained youths. The Fourteenth Amendment Due Process Clause requires juvenile justice facilities to provide youth with conditions of reasonable care and safety. Youngberg, 457 U.S. at 324. LCJDC's failure to adequately address the risk of the spread of infectious diseases, coupled with its inadequate fire safety practices, exposes youths detained there to great risks.

Cells are extremely dirty, contain torn mattresses, and the toilets in the cells were not adequately cleaned. The showers were similarly filthy; such environmental considerations are

- 15 -

critical in preventing the spread of infectious agents such as methicillin-resistant staphylococcus aureus ("MRSA").[5]

LCJDC's fire safety and emergency planning is also inadequate and exposes both youth and staff to an unnecessarily high risk of harm, including death. Documentation showed that although the facility conducts monthly fire drills, the facility's plan for evacuating youth and staff is dangerous. LCJDC's plan is to evacuate everyone to a small outdoor recreation area that is directly adjacent to the detention area and is enclosed with tall brick walls. This would be dangerous in the event of a fire. LCJDC also fails to have a plan for evacuation in the event of a tornado or other emergency.

## 9.   LCJDC violates the due process rights of youth by failing to provide a grievance system.

A grievance system provides detained youth with a mechanism to resolve disputes regarding their detention. Given the arbitrary discipline process and the other deficiencies noted in this letter, the absence of a grievance process contributes to the unconstitutional conditions in the facility. LCJDC does not provide any forms for filing grievances or any confidential means for filing grievances, such as a locked drop box. According to the facility manual, the grievance process consists of a juvenile writing a statement of his or her grievance and handing that statement to the shift supervisor. The shift supervisor then submits the statement to the assistant director, who then conveys it to the facility director. There is nothing confidential about any aspect of this process.

Youth at LCJDC have a right to file grievances with the facility regarding their treatment, as well as a right not to be punished for using the grievance system. See Decker v. McDonald, No. 5:09 Civ. 27, 2010 WL 1424322, *15 (E.D.Tex. Jan. 11, 2010) (noting that the law is well established that prison officials may not retaliate against an inmate who exercises his right of access to the courts or use of the grievance system); see also Hasan v. U.S. Dep't of Labor, 400 F.3d 1001, 1005 (7th Cir. 2005) (holding that, unless frivolous, prisoners' grievances are entitled to First Amendment protection).

Basic due process and generally accepted professional standards for juvenile facilities require a grievance process that affords youth confidentiality, protects them from retaliation by staff, is unimpeded, and offers a level of review for appeals. At the time of our tour, the director of LCJDC had not received a grievance since October 2005 – a period of more than four years. The fact that no grievances have been received by the director since October 2005 is testament to

---

[5]      MRSA is a highly contagious bacteria commonly found in institutional settings that is resistant to certain antibiotics, including methicillin. Centers for Disease Control and Prevention, at http://www.cdc.gov/ncidod/dhqp/ar_mrsa_ca_public.html. The disease presents itself at first as a boil or sore on the skin, and is easily spread through contact with an infected person or with a surface the person has touched. Id. In some cases, MRSA can lead to serious complications, including surgical wound infections, bloodstream infections, and pneumonia. Id.

the inadequacy of the process. We find that LCJDC's grievance process is a contribution factor to unconstitutional conditions.

## B.   YOUTHS' RIGHTS TO ADEQUATE EDUCATIONAL SERVICES ARE BEING VIOLATED AT LCJDC

LCJDC consistently fails to provide youth with adequate general education services. Although the County has asserted that complying with the law is difficult due to the transient nature of the youth population and limited resources, these challenges are not unique to this facility and do not excuse the County from providing proper educational services to detained youth. Specifically, Mississippi state law requires that youth receive a minimum of five hours of educational instruction each weekday during the academic year. Miss. Code Ann. § 37-13-91(d), as amended.

The denial of education services to detained youth that are comparable to those provided by the State to non-detained youth violates due process and equal protection rights. Plyler v. Doe, 457 U.S. 202, 224 (1982) (deprivation of basic educational services must be rationally related to a substantial goal of the state); Donnell C. v. Illinois State Bd. of Educ., 829 F. Supp. 1016, 1018-19 (N.D. Ill. 1993) (a juvenile facility's denial of education services and provision of education services inferior to those of non-detained youth violated due process and equal protection claims of youth at the facility). In cases discussing the provision of education to detained youth, courts have recognized the essential function of education. See, e.g., Morgan v. Sproat, 432 F. Supp. 1130, 1150-51 (D. Miss. 1977) (holding that juvenile facility must provide sufficient education and vocational training to residents in order to reduce recidivism and promote successful reintegration into society).

Furthermore, students with disabilities have federal statutory rights to special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. See Honig v. Doe, 484 U.S. 305, 310 (1988) (noting that the Education for All Handicapped Children Act, as amended by IDEA, "confers upon disabled students an enforceable substantive right to public education in participating States"). IDEA requires states that accept federal funds to provide educational services to all children with disabilities between the ages of three and twenty-one years, even if the children have been suspended or expelled from school. 20 U.S.C. § 1412(a)(1)(A). Accordingly, the State must provide such services to youth in juvenile justice facilities. See id. (conditioning funds on the availability of services to "all children with disabilities"); 34 C.F.R. § 300.2(b)(1)(iv) (applying IDEA requirements to "all political subdivisions of the State that are involved in the education of children with disabilities, including . . . State and local juvenile and adult correctional facilities"); see also Alexander S. By and Through Bowers v. Boyd, 876 F. Supp. 773, 788 (D.S.C. 1995) (finding IDEA applicable to school-age detainees in juvenile detention facilities). IDEA also requires schools to have procedures for identifying and testing students with disabilities. 34 C.F.R. § 300.111(a)(1)(i).

Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, similarly obligates the State to provide youth confined in its institutions with educational services. Section 504 requires that "[n]o otherwise qualified individual with a disability in the United States, as

- 17 -

defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Although the County is obligated to provide free and appropriate education to qualified students with disabilities under both the IDEA and Section 504, special education services are virtually non-existent at LCJDC. The facility does not appropriately collect and analyze academic and behavioral data for students. Because of this, students at LCJDC often do not receive appropriate special education services as required by IDEA. Specifically, LCJDC is noncompliant with IDEA with respect to: 1) Child Find (see infra, below); 2) general education interventions; 3) Individual Education Programs ("IEPs"); 4) access to the general education curriculum for students receiving special education services; 5) behavioral supports; 6) staffing; and 7) transition services.

1. **LCJDC violates the due process and equal protection rights of youth confined there by failing to provide them with appropriate general educational services.**

Youth at LCJDC do not receive adequate educational services during detention, in violation of their equal protection and due process rights. Under State law, youths are entitled to a minimum of five hours of educational instruction each weekday during the academic year, Miss. Code Ann. § 37-13-91(d), as amended. Students at LCJDC reported receiving instructional class only Monday through Wednesday until the week of our November 2009 tour. Beginning with the week of our tour, students and staff stated that instruction occurs Monday through Thursday, with Friday reserved for television or movies. Youth detained at LCJDC are not receiving educational services consistent with the State's mandatory minimum of 5 hours each weekday.

LCJDC fails to maintain any educational records and coursework does not align with that required for a student in the community to obtain a high school diploma. During classroom observation, one female student in her mid-teens was seen completing a worksheet reviewing elementary addition (e.g., $2 + 3 = 5$). Such instruction does not allow students to access grade-level curriculum available to non-detained youth. Additional inadequacies of LCJDC's general educational services are mentioned throughout the discussion of special educational services below.

2. **LCJDC violates federal law by failing to provide adequate Child Find procedures.**

IDEA requires that the State have in effect policies and procedures to identify, locate, and evaluate youth suspected of having a qualifying disability that would entitle them to special education services. 34 C.F.R. 71 § 300.111(a)(1)(i). This is known as "Child Find." Child Find can sometimes be as simple as asking a detained youth whether he or she has ever received special education services at the community school.

Although a structured intake assessment form exists at LCJDC, Child Find is significantly limited by inadequate or non-existent assessments and faulty scoring. LCJDC's intake forms do not capture data regarding special education status or history. Rather, the basic screening forms are limited to evaluating the educational and vocational status of youths. In our individual interviews, we identified two youths, A.E. and A.F., who had previously received special education services elsewhere but had not been identified by LCJDC as possibly having a disability entitling them to special education services. LCJDC's intake forms do not capture data regarding special education status or history necessary for Child Find.

Even if an assessment form utilizes popular evaluative tools, such as the Massachusetts Youth Screening Instrument Version 2 ("MAYSI-2") used by LCJDC, such tools are only effective for Child Find if properly analyzed and disseminated in a timely fashion. The current evaluative tools fail to satisfy these criteria. Basic scoring of intake assessments is not properly completed, and data is not used to properly guide instructional accommodations. After a student completes a basic screening, LCJDC scores the assessments using percentages and not grade level. However, given the nature and purpose of these forms, reporting the assessment as a percentage score is ineffective in guiding the teacher towards determining whether special education modifications are necessary. Moreover, score forms based on the assessments are only completed when a student is exiting the facility. Accordingly, even if the assessments were scored in a manner that would allow the teacher to make proper adjustments to a youth's curriculum or to evaluate a youth for special education services, the data would be unavailable for this purpose until the student has left the facility. LCJDC's intake and screening procedures, therefore, inadequately assist in identifying students in need of special education and related services.

### 3.   LCJDC violates federal law by failing to provide general instructional and evaluative interventions.

Prior to evaluation of a student for special education, IDEA requires that the State review data-based documentation of the student's progress and consider whether the student is being provided appropriate instruction by a highly qualified teacher. 34 C.F.R. 71 § 300.309(b)(1)-(2). The State must further document the student's behavior in that student's learning environment, including the regular classroom setting.

There is no evidence that LCJDC engages in academic or behavioral pre-referral/general education interventions, data collection, or observations. Both academic and behavioral pre-referral/general education interventions should include specific methods for data collection in order to objectively evaluate student progress and the possible need for special education services.   LCJDC's data collection processes are inadequate. This incomplete data is particularly troubling for students at the warning level for suicidal ideation, traumatic experiences, or anger. These youths may be entitled to special education services, but they are not being identified at LCJDC. During our tour, 6 of the 13 youths tested at the warning level on the facility's tests but were not receiving any special education services.

- 19 -

4. **LCJDC violates federal law by failing to provide Individualized Education Programs for youth in need of special education services.**

IDEA requires that each student with a disability have an Individualized Education Program ("IEP") to ensure that the student receives adequate special education services. 34 C.F.R. 71 § 300.323(a). No IEPs were available during our tour, and although several IEPs were provided post-tour, none were for students present at the facility during our visit. During our tour, we discovered a student with special needs who had been housed at LCJDC for 36 days with no IEP. This is a violation of IDEA.

IDEA also requires that LCJDC take reasonable steps to promptly obtain a youth's records, including IEPs or documents relating to a youth's special education status, from the previous public agency in which the child was enrolled. 34 C.F.R. 71 § 300.323(g)(1). LCJDC was unable to produce educational records for any student enrolled at the time of our tour, and staff stated that IEPs are often received after a youth has already left the facility. No data concerning student academic and behavioral IEP goals was available while on site, nor was there any indication that parents/guardians and IEP team members had met regarding any student. The absence of this data is a gross violation of IDEA.

In addition, IDEA requires that teachers implement each child's IEP, including specific accommodations, modifications, and supports. 34 C.F.R. 71 § 300.323(c)(2). No instructional adaptations were observed at LCJDC nor were any adaptations listed on lesson plans. Moreover, lesson plans were incomplete, there was no evidence of academic or behavioral-related record keeping, and lesson plans did not differentiate assignments for students at various levels. The inadequacy of lesson plans and instructional adaptations may be partly attributed to the failure to provide the teacher with IEPs until after a youth has left the facility. Without an IEP, it is impossible for the teacher to properly instruct students according to their individual needs as is required under IDEA.

LCJDC's failure to maintain IEPs violates several federal requirements, notably that: 1) adequate records are not obtained at intake or sent out at exit from LCJDC; 2) IEPs are not developed, reviewed, or reevaluated in accordance with federal law; 3) there is a high risk of inconsistencies between previous and current levels of special education service for youths; 4) there is a lack of parent/guardian and IEP team signatures; 5) there is a lack of IEP implementation and data collection; and 6) there is a possible lack of relationship between the disability of an individual youth and the IEP goals. 34 C.F.R. 71 § 300.320(a)(2)(i-ii).

5. **LCJDC violates federal law by failing to provide access to the general education curriculum for youth in need of special education services.**

LCJDC's common practice of segregating youths for discipline problems during school fails to comply with IDEA's requirement that LCJDC provide comprehensive educational services to students. 34 C.F.R. 71 § 300.304(b)(1). Specifically, no education services are available to students who are sent to their cells for discipline problems. When a student misbehaves, LCJDC routinely returns the youth to his/her cell for the remainder of the day with

no school work, even when the youth's behavior has improved. This is a patent violation of IDEA. During our tour, 13-year-old youth A.H. was in his cell without any schoolwork for the entire school day because he had refused to do schoolwork in the classroom. Our interview with R.S. revealed a calm and compliant youth who should have been returned to the classroom. Pursuant to federal law, educational services should be comprehensive so as to enable youths to continue to participate in the general education curriculum even if they must be temporarily segregated. Where safety or other penalogical interests are involved, LCJDC should make individualized adaptations and return the student to class as quickly as safely possible.

### 6. LCJDC violates federal law by failing to provide adequate behavioral supports for youth.

LCJDC fails to provide positive behavioral interventions, supports and other strategies to address negative behavior, as required by IDEA. 34 C.F.R. 71. § 300.324(a)(2)(i). Positive behavioral interventions and supports include interventions for youth at the facility level, secondary interventions for youth with additional needs, and tertiary interventions for youth who require individualized behavioral interventions.

Although LCJDC employs a school-wide social skills curriculum, the primary approach to behavioral problems is reactive. As noted above, LCJDC inappropriately segregates students in cells for the remainder of the school day rather than correcting problematic behavior in the classroom. Segregation is inconsistent with IDEA, and there is no evidence that a youth's disability is considered when students are sent back to their cells or in the administration of consequences for behavioral misconduct. During our tour, we observed an announcement stating: "Any juvenile found to be disruptive to the orderly running of this facility will be recommended to 90 days detention or training school." Such reactive and sporadic disciplinary measures fail to adequately remedy or deter problematic behavior and are particularly inappropriate for youth with disabilities. Two out of seven students we interviewed regarding education reported that no reinforcement was provided as an incentive for positive behavior. Moreover, no rules or consequences were posted in the classroom as guidelines for behavior.

Perhaps the most egregious concern regarding LCJDC's use of segregation is the failure to maintain any data regarding youth segregation. No data is available regarding length of time or frequency of segregation; reason for segregation; youth behavior while segregated; or guidelines for use of segregation. Without such data, "manifestation determination" hearings cannot occur.[6] Further, failing to chronicle segregation use prevents development of, and implementation of, modifications to general education interventions and behavior intervention plans ("BIPs"). IDEA requires that LCJDC conduct a manifest determination when it decides to change the placement of a student with disabilities because of that student's violation of the code

---

[6]    Manifestation determination hearings are employed when a student who receives special education services is considered for suspension, expulsion or any alternative placement due to some behavioral concern. The process is used to determine if the actions that resulted in the consideration of some disciplinary action against the student were manifestations of the student's disability.

- 21 -

of conduct. LCJDC's failure to log this data regarding youth segregation is a patent violation of IDEA.

Based on our review of teacher reports, it appears that students who missed up to two days of school per week were allowed to watch movies on Fridays as incentive for positive behavior. This reward system is problematic because it disengages students from instruction during the movies and permits an excessive number of absences. LCJDC's system to address student behavior is ineffective and places youth with disabilities at a significant disadvantage for maintaining access to the general education curriculum. More specific behavioral reinforcements should be implemented throughout each day as part of a facility behavior management program.

To adequately address student behavior, LCJDC should implement secondary behavioral interventions for youth who do not need individual programs but need support beyond the facility plan. Under IDEA, when a youth's "behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior," 34 C.F.R. 71 § 300.324(a)(2)(i). An effective behavioral intervention plan is an intervention that is designed to promote positive, pro-social student behavior.

Pursuant to IDEA, behavior that is a manifestation of a disability should result in a functional behavior assessment and the development or modification of the current behavior intervention plan. Teachers and staff should be held accountable for consistently and accurately evaluating student behavior, recording data, and using student behavioral data, as per individualized programs. At LCJDC, no evidence of any functional behavior assessment or individual behavior plans exists. Further, it is not apparent that teachers and staff are held accountable for consistently and accurately evaluating student behavior, recording data, and using student behavioral data.

### 7. LCJDC violates federal law by failing to provide adequate educational staffing for youth in need of special education services.

Although the student-teacher ratio at the time of our tour of LCJDC was acceptable at 13 students per 1 teacher, the current teacher is neither appropriately licensed nor qualified, in violation of IDEA. Additional teachers who are licensed and qualified are needed to meet the requirements set forth in IDEA. A staffing plan should be devised and implemented based on these current needs, and in light of federal requirements.

### 8. LCJDC violates federal law by failing to provide adequate transition services for youth in need of special education services.

Although IDEA requires that facilities provide transitional services, none exist at LCJDC. IDEA includes two major components in its definition of the group of activities labeled as "transition services." First, transition services should be located within a results-oriented process focused on preparing students for a fruitful life outside of the school context. Second, the

transition services that a given student receives should be based on the individualized needs of that student.

Vocational technology courses may help provide transitional services for youths. We reviewed a LCJDC memorandum about a vocational technology program that was supposedly implemented in Fall 2009. The curricula listed classes in auto mechanics and repair, brick masonry, wood shop, refrigeration and air conditioning, culinary instructions, cosmetology, and computer technology. In reality, however, no vocational education courses exist at the facility. If the facility had vocational programs, they would need to be offered in accordance with transition services outlined in a student's IEP. Since there were no IEPs available, it is unclear whether some students have vocational education listed on their IEPs.

An additional concern regarding transition services is the lack of comprehensive and formal information concerning academic progress, which is necessary to report back to a student's home school upon exiting the facility. Although general transition procedures were provided, the lack of appropriate education and special education services, as well as academic and behavioral data, makes communication of youth progress impossible except for very general statements.

## V. REMEDIAL MEASURES

In order to rectify the identified deficiencies and protect the constitutional and federal statutory rights of youth confined at Leflore County Juvenile Detention Center, the County should implement the minimal remedial measures set forth below. Implementation of the measures should comply with generally accepted professional standards in order to ensure that youths are adequately treated, protected from harm, and provided with appropriate educational services.

## A.  PROTECTION FROM HARM

### 1.  Restraints

Generally accepted professional standards require that restraints never be used to punish youth. Every application of mechanical restraints or use of force – including handcuffs, leg shackles, belly chains, or other such restraints – should be fully documented, including the circumstances leading to the application, efforts used to de-escalate the situation, the specific manner or technique in which force was applied, and the duration of the incident. The current facility practice of restraining residents to the bed should be immediately stopped. Any restrained juvenile should be constantly observed by staff to ensure safety.

LCJDC should develop and implement written policies and procedures that establish a graduated set of interventions that avoid the use of physical force or mechanical restraints. Generally accepted practices for juvenile justice facilities require that physical force be used by staff only in exceptional circumstances when all other pro-active, non-physical behavior management techniques have been unsuccessful and the youth presents a danger to himself or

- 23 -

others. In the limited circumstances when physical force is appropriate, staff should employ only the minimum amount necessary to stabilize the situation and protect the safety of the involved juvenile or others. Therefore, detention staff should be trained in non-physical, verbal interventions to de-escalate potential aggression from youth.

Youth who have been subject to force or mechanical restraints should be assessed by a medical professional following the incident regardless of whether there is a visible injury or the youth denies any injury. Subsequently, management should conduct a formal review of the incident to determine whether staff acted appropriately. The post-incident review should also be utilized to identify any training needs and debrief staff on how to avoid similar incidents through de-escalation.

## 2. **Disciplinary Due Process**

Youth detained at juvenile justice facilities have a right to due process protections in the event that they are subjected to discipline or punishment. LCJDC should establish a disciplinary system, including notification to all youth of the facility rules, the consequences for violating those rules, and their rights if they are charged with a rule violation. Youth should receive instruction on the facility rules and the disciplinary process during orientation. This information should also be provided in a facility handbook provided to each youth during orientation and should be displayed in the youths' living and program areas. If a youth is charged with a violation, minimally adequate due process protections should include: 1) the provision of written notice of the alleged violation to the detainee/youth/resident at least 24 hours prior to a hearing; 2) a written statement by the fact-finder(s) as to the evidence relied upon and the reasons for the disciplinary action taken; and, 3) unless it interferes with institutional safety, the youth should have the opportunity to present witnesses and evidence at the hearing.

Administrative and disciplinary segregation should be used appropriately. Administrative segregation should only be used as an emergency measure to control a youth whose behavior poses an immediate risk of harm to himself or others or who requires protective custody, either at the youth's request or the facility's assessment. Youths who are placed in administrative segregation for behavioral reasons should be removed from segregation as soon as their behavior no longer poses an immediate risk of harm to themselves or others. Youths placed in administrative segregation for behavioral reasons should also be provided with a due process hearing every 24 hours any time their segregation exceeds 24 hours. Disciplinary segregation should only be used as a sanction for a major rule violation, and each youth should receive a due process hearing prior to being sent to disciplinary segregation. No youth should be placed in segregation for longer than three consecutive days except for protective custody purposes.

## 3. **Reporting & Investigating Abuse**

LCJDC should adopt and implement a zero-tolerance policy for staff abuse of youths, and staff should be consistently held accountable when policy violations occur. Serious incidents, allegations of abuse, and allegations of staff misconduct should be adequately and timely investigated by neutral investigators with no involvement or interest in the underlying event.

Staff conducting these investigations should receive adequate competency-based training on the investigation process, which should be completed in a timely fashion and no later than 30 days after an incident or allegation. In the rare cases where an exception to this time frame is warranted, the exception should be documented and not granted on the basis of inadequate investigator staffing. LCJDC should also develop and implement a written process to report resident's allegations of staff abuse to the State as mandated reporters.

### 4. Classification

LCJDC should develop a written classification policy that takes into account: 1) separation of older residents from younger residents; 2) separation of males from females; 3) separation of violent from non-violent youth; 4) maturity; 5) presence of mental or physical disabilities; 6) suicide risk; 7) offense; and 8) case-specific information about youth who should be separated from each other. The policy should address plans to protect youth who have been victimized at the facility or who have concerns about their safety.

### 5. Medical and Mental Health Care

#### a. Screenings and Treatment

In order to comply with generally accepted professional standards to provide adequate health care services to youths in need of medical and mental health care attention, LCJDC should provide adequate, comprehensive, and reliable screening and assessment services to identify youths with serious medical and mental health needs, both at intake and throughout the youths' time at LCJDC. All youth should undergo a health screening within one hour of admission to LCJDC, or as soon thereafter as reasonably possible, in order to obtain accurate information about the youth's medical and mental health. Screenings should include information about, physical health, suicide risk, alcohol and other drug use and abuse, aggressive behavior, family relations, peer relations, social skills, educational status, and vocational status. Corrections staff who conduct screenings should be trained by a health authority. Youth requiring routine, urgent, or emergency care should receive timely referrals to qualified health professionals.

A qualified mental health professional should complete an initial mental health assessment form that summarizes the youth's prior mental health history and includes a current mental status examination, suicide risk inquiry, provisional diagnosis, and treatment plan, if applicable. Youths should be referred for mental health services where such services are indicated as a result of the mental health screening and assessment process, or where a youth demonstrates symptoms of mental illness that significantly interfere with his or her ability to complete the facility's treatment program. Mental health assessments should be adequately documented and, where indicated, should begin during the youth's time in the intake unit and include: pursuit and review of prior behavioral health records; contact with the youth's family; consultation with facility staff; interviews with the youth; and, where indicated, specialized testing and medical consultation. Medical and mental health staffing should be sufficient to provide adequate medical and mental health care services to all youths requiring such services.

LCJDC should establish and maintain adequate, formal, individualized treatment planning that articulates specific planned behavioral interventions. At a minimum, interventions should consist of regularly scheduled individual counseling. LCJDC should attempt to involve families in the treatment planning process, and treatment plans should be periodically reviewed and revised as appropriate. Treatment plans for youths who are prescribed psychotropic medications should specify the medication, its target symptoms, and the basis for using it. Qualified mental health professionals should provide and adequately document individual counseling for youths who require counseling. Documentation of counseling sessions should include clinical data regarding the youth's subjective expressions or mental status, problems addressed and the means of addressing them, the clinician's impressions of the youth's progress, and any plan for continuing treatment. LCJDC should also establish and maintain adequate transition planning. At a minimum, mental health staff should provide a written summary of the youth's mental health treatment, his response to treatment, and a recommendation regarding further care.

The provision of adequate medication management should ensure that: 1) a prescribing professional performs and adequately documents an assessment supporting the prescription; 2) the prescribing professional adequately monitors youths on psychiatric medications by conducting and adequately documenting medication monitoring visits at least monthly, or more frequently as indicated; and 3) appropriate consent is obtained prior to starting a youth on a medication.

    **b.**    **Suicide Prevention and Related Mental Health Care**

In order to comply with generally accepted professional standards to provide adequate services to potentially suicidal youths and take appropriate action to prevent youths from engaging in self-injurious behavior, including suicide, the County should establish a comprehensive suicide prevention program. All staff members who interact with youths should receive at least eight hours of initial, competency-based suicide prevention training and two hours of annual competency-based training thereafter. The initial training should cover the following topics: 1) avoiding obstacles to suicide prevention, juvenile suicide research; 2) why facility environments are conducive to suicidal behavior; 3) warning signs and symptoms of suicide; and 4) components of the agency's suicide prevention program. The annual training should review any changes in the facility's suicide prevention policy and update staff on any serious suicides and/or attempts, not simply repeat initial training.

LCJDC should ensure ongoing identification of suicide risk for youths. Immediately upon their arrival at the facility, newly admitted youths should receive adequate intake screening for suicide risk before leaving the intake area. Any staff member should be able to place a youth on suicide precautions. All potentially suicidal youths should be placed on suicide precautions unless a qualified mental health professional determines, following a face-to-face evaluation, that the youth is not suicidal. Youth who are admitted to segregation should receive a written assessment of suicide risk by mental health staff or by medical staff if mental health staff members are unavailable. LCJDC should ensure adequate communication among staff regarding youths' potential suicidality. Correctional, medical, and mental health staff should participate in

- 26 -

treatment team meetings, and all staff should understand facility policies regarding communication.

Potentially suicidal youths should be placed in rooms that are free of suicide hazards, including protrusions and tying off points, and should not be placed in isolation. Removal of youths' clothing, other than belts and shoelaces, use of restraints, and suspension of routine privileges such as visits, phone calls, and recreation, may only be employed by a qualified mental health professional as a last resort if a suicidal youth is engaging in self-destructive behavior. LCJDC should maintain sufficient staffing levels to supervise youths who require constant observation.

Youths who are removed from suicide precautions should receive regular follow-up assessments by mental health staff, including individualized treatment plans for suicidal youths that address relapse prevention and initiate a risk management plan. The risk management plan should describe: the likely signs, symptoms, and circumstances for a recurrence of suicide risk, prevention of suicidal thoughts, and actions the youth or staff can take in response to the recurrence of suicidal thoughts.

Adequate mortality-morbidity reviews should be conducted, separate from any other necessary formal investigations, after a completed suicide or a serious suicide attempt. The reviews should include: 1) review of the circumstances surrounding the incident; 2) review of procedures relevant to the incident; 3) review of all relevant training provided to involved staff; 4) review of pertinent medical and mental health services/reports involving the youth victim; 5) review of any possible precipitating factors that may have caused the youth to attempt or commit suicide; and 6) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures. The mortality-morbidity review team should be multidisciplinary and include management and line staff from the direct care, medical, and mental health areas. The reviews should focus on the incident and what the facility can learn to prevent future incidents.

Furthermore, LCJDC should develop an adequate plan for intervening in suicide attempts, including ensuring that staff members notify emergency medical personnel immediately after the discovery of a life-threatening emergency; ensuring that all housing units contain adequate emergency equipment, including rescue tools; and ensuring annual mock drills for suicide attempts and annual competency-based instruction in the use of emergency equipment for staff. The facility should also establish and maintain an adequate quality assurance program to measure compliance with the facility's suicide prevention program, including the remedial measures outlined above.

## 6. **Programming**

LCJDC should ensure the availability of adequate rehabilitative programming, including, but not limited to, education, counseling, and mental health services. LCJDC should provide for evening and weekend programs and activities that allow youth to engage in meaningful activities. In addition, LCJDC should develop and implement a behavior management system

that outlines prohibited behaviors (major and minor) and the sanctions or consequences for these behaviors. Written policies and procedures should allow youth at least one hour of large muscle exercise daily.

### 7. Staffing and Supervision

LCJDC should ensure that staffing and supervision levels are appropriate to adequately supervise all youths. The staffing pattern should consider the structural design of the LCJDC, the need to monitor residents on suicide watch, and other day-to-day operations. For youths who are locked in their cells, staff should make and document visual checks of the youths at random intervals at least every 15 minutes with youths sufficiently visible to permit staff to verify their well-being. Documentation of monitoring should be accurate and contemporaneous.

LCJDC should develop and implement appropriate training for staff. Newly hired staff should receive the requisite hours of competency-based training and all staff should receive appropriate additional hours of annual training after the first year of employment. All such trainings should include, but should not be limited to, training in use of force, including safe crisis management and de-escalation techniques; training specific to the supervision of youths, including training on adolescent development; and training in identifying and responding to fights, assaults, and sexual activity.

### 8. Environmental Safety

LCJDC should develop written housekeeping and emergency preparedness plans to ensure that youth are provided reasonable conditions of care and safety. The housekeeping plan should address daily cleanliness and sanitation issues. Linens, mattresses and clothing should be routinely inspected and replaced as needed. Written policies and procedures should also be developed to address facility readiness for fires and other emergencies, including modifying the current evacuation plan to ensure safe egress during emergencies.

### 9. Grievance System

Youths should have an effective and reliable process to raise grievances. The process should protect youth from possible retribution by staff. A grievance coordinator should track, categorize, and tabulate all grievances, which should be reviewed and addressed in a timely manner within five days of receipt. Youths should be provided with notification of the final resolution of their grievances, and bureaucratic responses to grievances should be prohibited. Grievance forms should be freely accessible in all areas frequented by youths, and youths should have access to a grievance box from which grievances are retrieved daily.

## B.   EDUCATION

### 1.   General Education

In order to comply with federal constitutional and state statutory requirements for providing adequate general education services to youths, the County should provide youth in disciplinary confinement with the full range of educational services, provide all youth reasonable access to reading and writing materials in their cells, and ensure youths at LCJDC receive the same type and number of daily and weekly instructional minutes as other youths in the State's schools.

### 2.   Child Find Procedures

In order to comply with federal statutory requirements for providing adequate special education services to youths with disabilities, the County should provide adequate screening of youth for special education needs. This includes obtaining prior education records from school systems in a timely fashion. Special education services should be provided to all youth with disabilities who are in need of special education and related services after they are identified, located, and evaluated in accordance with Child Find. Youths should be asked about previously offered special education during intake, and LCJDC should ensure documentation of academic interventions for youths who are struggling.

### 3.   General Instructional and Evaluative Interventions

LCJDC should develop, implement, and maintain adequate pre-referral and general education interventions. LCJDC should also collect and maintain comprehensive educational records for all youth at the facility. Prior to evaluating a youth for special education, LCJDC should determine whether the youth is being provided appropriate instruction by a highly qualified teacher and review data-based documentation of the youth's progress, including adequate documentation of the youth's behavior in his learning environment and regular classroom setting.

### 4.   Individualized Education Programs

Pursuant to IDEA, LCJDC should develop, implement, and maintain an adequate IEP for each youth who qualifies for an IEP and provide necessary related services. IEPs should be updated and/or completed as quickly as possible upon intake and reviewed at least annually. Services provided to youths with IEPs should be comparable to those described in the youth's IEP from his previous agency in the absence of adequate justification for changes in services. Parents and/or guardians should be included in IEP meetings to the extent possible. IEPs should be adequately implemented and include collection and reporting of data on youth progress and individual accommodations.

### 5. Access to General Education Curriculum for Youth in Need of Special Education Services

In order to ensure that youths with disabilities have sufficient access to special education services, LCJDC should provide that: 1) youths are enrolled in school within two days of intake; 2) youths are provided with access to the general education curriculum; 3) youths with, and at risk for, disabilities are provided with adequate direct instruction using research-based instructional approaches; 4) youths with disabilities receive not less than five hours of instruction daily, the same number of daily and weekly instructional minutes as other youths in the State's schools; 5) youths with disabilities are provided appropriate instructional adaptations; and 6) adequate attendance records are maintained.

### 6. Behavioral Supports

Youths with disabilities should also receive adequate behavioral supports through a systemic behavior plan that does not permit the use of segregation and exclusionary settings. Manifestation determination hearings should occur for youths with disabilities who are removed or segregated from their stated appropriate educational setting for disciplinary, administrative, or other reasons, in excess of ten days or in a pattern of removals. Secondary interventions should be implemented for youths who do not need individual behavior programs but need behavioral supports beyond those offered in the facility plan.

### 7. Staffing

LCJDC should provide adequate special education staffing by developing, implementing, and maintaining an education staffing plan and ensuring an adequate number of licensed and highly qualified teachers, as well as qualified substitute teachers, to provide instruction in all necessary courses.

### 8. Transition Services

Results-oriented, individualized, coordinated transition services should be provided for youths with disabilities who are 16 years old or older to facilitate the youths' movement from school to post-school activities.

* * * * *

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. While we will provide a copy of this letter to any individual or entity upon request, as a matter of courtesy, we will not post this letter on the Civil Rights Division's website until 5 calendar days from the date of this letter.

The collaborative approach the parties have taken thus far has been productive. We hope to continue working with the County in an amicable and cooperative fashion to resolve our outstanding concerns. Provided that our cooperative relationship continues, we will

- 30 -

forward our expert consultants' reports under separate cover. These reports are not public documents. Although our expert consultants' reports are their work – and do not necessarily represent the official conclusions of the Department of Justice – their observations, analyses, and recommendations provide further elaboration of the issues discussed in this letter and offer practical, technical assistance in addressing them. We hope that you will give this information careful consideration and that it will assist in your efforts at prompt remediation.

We are obligated to advise you that, in the unexpected event that we are unable to reach a resolution regarding our concerns, the Attorney General is authorized to initiate a lawsuit pursuant to CRIPA after forty-nine days of your receipt of this letter to correct deficiencies of the kind we have identified. See 42 U.S.C. § 1997b(a)(1). We would very much prefer, however, to resolve this matter by working cooperatively with you.

Accordingly, the lawyers assigned to this matter will be contacting the attorney for the County to discuss next steps in further detail. If you have any questions regarding this letter, please call Jonathan M. Smith, Chief of the Civil Rights Division's Special Litigation Section, at (202) 514-5401.

Sincerely,

Thomas E. Perez
Assistant Attorney General

cc:     Joyce Chiles, Esq.
        Board Attorney
        Leflore County Board of Supervisors

        Robert Fitzpatrick
        Director
        Leflore County Juvenile Detention Center

        John Marshall Alexander, Esq.
        United States Attorney for the
        Northern District of Mississippi